RECEIVED
SEP 1 5 2014
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CIVIL ACTION NO. 13-2453 |
| VERSUS | JUDGE REBECCA DOHERTY |
| CEDYCO CORP. | MAGISTRATE JUDGE HILL |

## MEMORANDUM RULING

Pending before the Court is a "Motion for Default Judgment" [Doc. 7] filed by the plaintiff, the United States of America ("USA"), against defendant, Cedyco Corporation ("Cedyco"). For the reasons stated herein, the motion is GRANTED and judgment is entered against Cedyco in the sum-certain amount requested of $231,093.05.

### Factual and Procedural Background

Plaintiff, the United States government, filed the instant motion to recover the sum-certain amount of $231,093.05 from defendant Cedyco, whom the United States alleges is the statutory "responsible party" for an offshore facility and is strictly liable under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§2701-61, for the removal costs resulting from the discharge and substantial threat of discharge of oil at its facility. After Cedyco declined to take responsibility for oil removal at its facility, the Coast Guard's National Pollution Funds Center ("NPFC") authorized $231,093.05 to be paid out of the Oil Spill Liability Trust Fund for removal costs at Cedyco's facility, billed to Federal Project Number N10027. On March 22, 2012, the NPFC sent Cedyco a bill for the $231,093.05 in removal costs paid from the Oil Spill Liability Trust Fund, which Cedyco did not

pay. The United States has attached the affidavit of NPFC case officer Michael P. Spence, which explains the funding process and provides supporting documentation itemizing the removal costs.

Plaintiff filed the instant Complaint on August 12, 2013, asserting violations of the Oil Pollution Act of 1990 ("OPA"); setting forth the costs incurred in cleaning up the discharged oil; and alleging the failure of Cedyco to pay these costs after being billed. On November 22, 2013, Cedyco was served with summons and a copy of the complaint, but it has failed to appear in this matter to date [Doc. 3]. On February 25, 2014, plaintiff filed a Request for the Clerk's Entry of Default, which was filed the following day [*See* Clerk's Notice of Entry of Default, Doc. 5]. On August June 20, 2014, plaintiff filed the instant Motion for Default Judgment [Doc. 7].

## Legal Standard

Pursuant to Federal Rule of Civil Procedure 55(a), a default judgment is proper "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend. . . ." Obtaining a default judgment requires a three-step process. First, "[a] default occurs when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules." *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). Once the default is established "by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). After the default has been entered by the clerk, plaintiff may apply to the clerk or the court for a judgment based on such default.[1] Fed. R. Civ. P. 55(b); *New York Life* at 141.

"The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is

---

[1] "[W]hen entry of default is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." *System Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy*, 242 F.3d 322, 324 (5th Cir.2001) (quoting *Williams v. Life Savings and Loan*, 802 F.2d 1200, 1203 (10th Cir.1986)). The Court has reviewed the return of service and the pleadings in this matter and concludes it has personal jurisdiction over defendants and subject matter jurisdiction over the claims.

concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." *Jackson v. FIE Corp.* 302 F.3d 515, 524 (5th Cir. 2002). "A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true." *Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). However, a defendant's default alone does not warrant entry of a default judgment; rather, "[t]here must be a sufficient basis in the pleadings for the judgment entered." *Id.* ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.")

Rule 55(b) grants a court discretion to convene an evidentiary hearing on the issue of damages. Fed. R. Civ. P. 55(b)(2)(B). Where "the amount claimed is a liquidated sum or one capable of mathematical calculation," a hearing is not necessary. *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979). "The court may rely on detailed affidavits or documentary evidence, supplemented by the judge's personal knowledge, to evaluate the proposed sum." *Richardson v. Salvation Army, Southern Territory, USA*, 161 F.3d 7 (5th Cir. 1998). The Court finds no hearing is necessary in this matter, as the amount claimed is a sum certain readily capable of mathematical calculation from plaintiff's affidavits.[2]

## Analysis

The United States' motion is supported by the following uncontroverted facts, contained within the Declaration of Michael Spence, and further bolstered by the attached supporting documentation, as more fully described below:

- Mr. Spence is a Senior Project Manager for the Case Management Division of the United States Coast Guard, National Pollution Funds Center ("NPFC"), who acts as a case officer responsible for providing funding from the Oil Spill Liability Trust

---

[2] The United States does not request a hearing on its motion, and implies a hearing is unnecessary.

- Fund ("OSLTF") to finance responses to oil spills on navigable waterways that occur in Louisiana, Texas, Oklahoma, Kansas, Nebraska, Missouri, Iowa, and Minnesota.

- The NPFC is the office within the U.S. Coast Guard with the responsibility and authority to administer the OSLTF, which was created pursuant to 26 U.S.C. § 9509. Pursuant to the Oil Pollution Act of 1990, 33 U.S.C, §2701 et seq. ("OPA"), the OSLTF is available to pay for oil removal costs when a responsible party fails to fund oil removal activities. Removal activities must be consistent with the National Contingency Plan ("NCP"). Removal costs include monitoring costs incurred by the Federal On-Scene Coordinators ("FOSCs") and personnel.

- An NPFC case officer is responsible for the financial management of oil spill cases managed by federal officials and funded with federal money. These responsibilities include reviewing and maintaining documentation for oil spill removal costs, approving and reconciling the costs, and preparing and issuing invoices to responsible parties.

- When an FOSC determines that a federal response must be made to an oil discharge, or a substantial threat of a discharge of oil, and that federal funding is needed to pay for the response, a Federal Project Number ("FPN") is issued to identify that project. Once an FPN has been assigned, the FOSC then uses the FPN to access the OSLTF to pay for costs incurred to conduct removal activities. The FOSC determines the number of personnel that will be needed to conduct removal activities and/or to monitor those activities. When a responsible party assumes responsibility for a removal action, the FOSC directs the Coast Guard personnel to monitor the cleanup contractor's activities to ensure consistency with the NCP. However, if the responsible party fails to conduct the removal action, then the FOSC will fund removal activities with funds from the OSLTF. The FPN is referenced on cost documentation related to the incident and is used to track all expenditures specific to that incident.

- Once federal funding from the OSLTF is required and an FPN number is assigned, the NPFC case officer is responsible for monitoring the case as it progresses by reviewing Pollution Reports submitted by the FOSC or his representative. Once removal activities are complete, the NPFC reviews all the documentation of removal costs before authorizing expenditures from the OSLTF. The documentation of removal costs includes the categories of expenses and specific amounts of removal costs incurred during the spill. The NPFC case officer reviews and maintains all such documentation. Payment of contractor costs is verified electronically through the Coast Guard's core accounting system. Coast Guard personnel, travel, and equipment costs are also submitted to the NPFC for review and payment.

- The NPFC case officer reconciles the removal costs and invoices for all removal

    costs and related claims paid from the OSLTF. If the responsible party refuses to pay the invoices, the case may be referred to the U.S. Department of Justice for litigation.

- Mr. Spence was assigned as the case officer for the removal action at Cedyco Corporation's Vermilion Bay tank battery facility, which was assigned Federal Project Number N10027.

- The Cedyco Corporation of Houston, Texas was identified as the permittee of the area in which the Cedyco facility was located and thus was liable for removal costs and damages as the responsible party under 33 U.S.C. §§ 2701(32)(C) and 2702(a).

- When Cedyco failed to take responsibility for the spill, the Coast Guard hired American Pollution Control Corp. ("AMPOL") for the removal action. At the Coast Guard's direction, AMPOL assessed the facility and removed 2,350 barrels of oil, cleaned the tanks, and removed the pipelines from the dual well to the tanks, and disassembled each of the three tanks in the tank battery. Following a bottom survey of the dual well served by this tank battery, AMPOL secured the wellhead from the potential of discharges by isolating and closing off the valve system of the dual well.

- After the response was completed, the Coast Guard received invoices from AMPOL for costs incurred during the removal action under FPN N10027, as follows:

  - On 08/15/2010, AMPOL submitted Invoice 10993 for the contractor's personnel, equipment, materials and other costs amounting to $25,297.76, and subcontractor costs amounting to $110,600.13, all for the period beginning on 03/2312010 through 07/14/2010. The Coast Guard paid $25,297.76 AMPOL for contractor costs and retained payment of $110,600.13 until AMPOL produced better documentation for these costs.

  - On 11/20/2010, AMPOL re-submitted the subcontractor costs in Invoice 11381 and was paid $110,600.13. On the same date, AMPOL submitted Invoice 11407 for the contractor's personnel, equipment, materials and other costs of $14,817.96, and subcontractor costs of $68,197.50. After reviewing the costs in this invoice, the Coast Guard paid AMPOL $83,015.46 for the removal action period from 07/07/2010 through 09/02/2010.

  - For the period of this removal action, from 03/23/2010 through 08/31/2010, the Coast Guard's oversight costs amounted to $11,542.50 for personnel and $637.20 for equipment.

  - The total costs for contractor, subcontractor, as well as Coast Guard oversight costs totaled $231,093.05 for the removal action under FPN N10027.

- Based on these payments from the OSLTF, Mr. Spence sent Cedyco a bill for the $231,093.05 in removal costs on March 22, 2012, which Cedyco did not pay.

Attached to Mr. Spence's Declaration is a "true and correct copy" of a spreadsheet showing a summary of the costs incurred during the response under FPN N10027, which includes Invoices 10993, 11381, and 11407, submitted by AMPOL and totaling $218,913.35. Also included are the Coast Guard's oversight costs of $12,179.70, which are supported by the Coast Guard's Project Summaries for the FPN N10027 removal action, as well as the bill for the total amount of $231,093.05, which Mr. Spence sent to Cedyco. Mr. Spence further declares as the custodian of NPFC's file for FPN N10027 that the exhibits attached to his Declaration are also included in NPFC's file for the oil spill responses under FPN N10027; that these exhibits are documents that recorded information at or near the time of the occurrence of the matters set forth therein; that these exhibits contain information transmitted by a person with knowledge of those matters; and that the exhibits are records kept in the regular course of NPFC's process of funding oil spill removal actions and pursuing cost recovery against responsible parties. Mr. Spence also verifies the exhibits are documents that were made during a regularly conducted activity as a regular practice. Mr. Spence's Declaration is verified under penalty of perjury, in accordance with 28 U.S.C. §1746.[3]

---

[3] 28 U.S.C. §1746 states:

1746. Unsworn declarations under penalty of perjury

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

This Court has reviewed the exhibits attached to the Declaration of Mr. Spence and concludes the exhibits support the Declaration of Mr. Spence.

The Fifth Circuit has made clear that to ensure oil spills are quickly and efficiently cleaned up, victims are compensated, and costs are internalized within the oil industry, "the OPA imposes strict liability on parties responsible for the discharge of oil ...." *See, e.g., Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir.2001). Although different courts employ different "tests" to determine whether the parameters of the OPA have been satisfied, the following factors have been recognized as necessary for the government to prove that a party is strictly liable under the OPA: (1) the defendant is a "responsible party" (2) for the "facility" or "vessel" (3) from which oil was discharged, or from which there was a substantial threat of discharge, (4) "into or upon the navigable waters or adjoining shorelines" and (5) that the discharge resulted in "removal costs and damages." *See U.S. v. Viking Resources, Inc.*, 607 F. Supp.2d 808, 815 (S.D. Tex. 2009); *see generally* 33 U.S.C. §2702(a); *see also United States v. Jones*, 267 F.Supp.2d 1349, 1353 (M.D.Ga.2003) (listing elements for liability under § 2702). *See also Rice v. Harken Exploration*, 89 F.Supp.2d 820, 823 (N.D.Tex. 1999) ("Under the OPA, a plaintiff must prove two elements: 1) that there is a discharge of oil or covered oil-related substances, and 2) that the discharge either went

---

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

(Signature)".

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

into navigable waters or poses a substantial threat to navigable waters of the United States. If plaintiff proves these elements, he recovers all damages that result from the discharge, see § 2702(2), including removal costs incurred, § 2701(31); the costs to prevent, minimize, or mitigate oil pollution, id.; any reasonable assessment costs, § 2701(5); the costs to replace personal property or the diminution in value to personal property, see § 2702(b)(2)(B); and the costs to repair, restore, and remediate real property or the diminution in value to the property.").

In the instant case, Cedyco has not controverted any of the allegations set forth by the government in its complaint. The government contends the removal action in question occurred at Cedyco Corporation's Vermilion Bay tank battery facility. Despite the fact that OPA litigants usually agree on what constitutes a "facility" under the statute, and the Fifth Circuit's express recognition that there is virtually no caselaw elaborating on this definition, courts have held that old tank batteries meet the statutory definition of "facility" for purposes of the OPA. See, e.g., *See U.S. v. Viking Resources,* 607 F. Supp.2d at 816. Cedyco does not challenge the government's allegation that it is the "responsible party" for the "facility" – as the permittee of the area in which the Cedyco facility was located – nor does it challenge the government's assertion that oil was discharged "into or upon the navigable waters or adjoining shorelines" and that the discharge resulted in "removal costs and damages." The supporting documents attached to the Declaration of Mr. Spence evidence the extent the damage that occurred as a result of the spill and the labor and materials utilized to clean up the damage.

Thus, under the statutory framework of the Oil Pollution Act of 1990,[4] it is undisputed that

---

[4] Judge Lemmon explained the history of the Oil Pollution Act in *In re Petition of Settoon Towing, LLC* as follows:

oil removal activities were necessary at Cedyco's Vermilion Bay tank battery facility; and Cedyco has been identified as the permittee of the area in which the Cedyco facility was located and is, therefore, liable for the removal costs and damage as the responsible party under 33 U.S.C. §§2017(32)(C) and 2702(a). Additionally, no party disputes ths the oil in question was discharged iunto, or posed a substantial threat to, navigable waters. Finally, the government has established that after the cleanup work was completed, the Coast Guard received invoices from AMPOL for the removal action totaling $231,093.05 in removal costs; a bill was sent to Cedyco for the $231,093.05 in removal costs on March 22, 2012, however, Cedyco did not pay.

## Conclusion

In light of the foregoing, the Court concludes the United States has established Cedyco's violation of the Oil Pollution Act and its liability thereunder for the claimed amounts. The United

---

Congress enacted OPA in response to the Exxon Valdez oil spill in Prince William Sound, Alaska. *Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir.2001) (citing Senate Report No. 101–94, reprinted in 1990 U.S.C.C.A.N. 772, 723). The law was intended to streamline federal law and "provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills with the petroleum industry." Id.

OPA imposes strict liability upon parties that discharge oil into "navigable waters," a term defined in the statute to mean "the waters of the United States, including the territorial sea." *In Re Needham*, 354 F.3d 340, 345 (5th Cir.2003); 33 U.S.C. § 2701(21). OPA further provides that "[n]otwithstanding any other provision of law ... each responsible party for a vessel or a facility from which oil is discharged ... into or upon the navigable waters or adjoining shorelines ... is liable for the removal costs and damages specified in subsection (b) of this subsection that result from such incident." 33 U.S.C. § 2702(a) (emphasis added); *see also In Re Needham*, 354 F.3d at 345 n. 5; *In re Taira Lynn Marine Ltd. No., LLC*, 444 F.3d 371, 382 (5th Cir.2006). A "responsible party" with regard to an offshore facility, FN1 is "the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement granted under the applicable State law ... for the area in which the facility is located (if the holder is a different person than the lessee or permittee) ..." 33 U.S.C. § 2701(32)(A). A "lessee" is "a person holding a leasehold interest in an oil or gas lease on lands beneath navigable waters ... or on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act ( 43 U.S.C. 1331 et seq.)." Id. at § 2701(16).

722 F.Supp.2d 710, 712 (E.D. La. 2010).

States has further satisfied the requirements for a default judgment under Rule 55 of the Federal Rules of Civil Procedure. Considering the foregoing, the "Motion for Default Judgment" [Doc. 7] is GRANTED. The government does not seek damages beyond the amounts paid to clean up the oil spill – that is $231,093.05 – as well as pre-judgment interest and the costs of this proceeding. Considering the foregoing, the plaintiff is awarded $231,093.05, plus pre-judgment interest pursuant to 33 U.S.C. 2705[5] from April 22, 2012 and interest from date of judgment until paid in full at the legal rate pursuant to 28 U.S.C. §1961; as well as the costs of this proceeding pursuant to 47 U.S.C. 553(c)(2)(C). The plaintiff shall file a Memorandum of Costs in the form required by the Clerk of Court within fourteen days of entry of the Judgment. *See* LR 54.3.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 15th day of September 2014.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

[5] 33 U.S.C. 2705 states in relevant part:

(a) General rule

The responsible party or the responsible party's guarantor is liable to a claimant for interest on the amount paid in satisfaction of a claim under this Act for the period described in subsection (b) of this section. The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages. Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled shall not preclude recovery by the claimant for damages not reflected in the paid or settled partial claim.

(b) Period

(1) In general

Except as provided in paragraph (2), the period for which interest shall be paid is the period beginning on the 30th day following the date on which the claim is presented to the responsible party or guarantor and ending on the date on which the claim is paid. . . . .

33 U.SC. §§2705 (a), (b)(1).